UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 12-0259 |
| VERSUS | * | JUDGE ROBERT G. JAMES |
| NORA SANTELLANA<br>LEE ANN TORRES | * | MAG. JUDGE KAREN L. HAYES |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, are two Motions to Suppress [docs. # 29, 31] filed individually by Defendants, Nora Santellana and Lee Ann Torres. For reasons stated below, it is recommended that the motions be **DENIED.**

On September 4, 2012, Corporal Brad Smith of the Ouachita Parish Sheriff Office stopped Lee Ann Torres ("Torres") and Nora Santellana ("Santellana") for a traffic violation on Interstate 20 heading eastbound in the Monroe, Louisiana, area. Defendant Torres was driving the automobile owned by Defendant Santellana, who was sitting in the front passenger seat. Pursuant to the stop, Corporal Smith ultimately searched the vehicle and discovered 7.8 kilograms of cocaine hydrochloride.

On September 19, 2012, a federal grand jury issued an indictment charging Defendants Torres and Santellana with (1) knowingly and intentionally conspiring and agreeing together to possess with the intent to distribute 5 kilograms and more of cocaine and (2) knowingly and intentionally possessing with the intent to distribute 5 kilograms and more of cocaine in violation of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18 United States Code, Section 2. [doc. # 14]. Having entered pleas of not guilty to the charges against them,

Defendants Torres and Santellana filed the instant motions to suppress evidence obtained as a result of the traffic stop. [docs. # 29, 31]. Following a delay for briefing and an evidentiary hearing held on December 4, 2012, the matter is now before the court.

## Background

The following facts were established via the testimony and evidence presented at the December 4, 2012 hearing held in this matter.

Corporal Brad Smith has been employed with the Ouachita Parish Sheriff's Office for the past ten years. On September 4, 2012, the date of the traffic stop, Corporal Smith was on patrol in a marked Ouachita Parish Sheriff's car on I-20 between the "Cheniere exit and Downing Pines." [doc. # 37, P. 4].

At approximately 2:30 a.m. on September 4, 2012, Corporal Smith and the Defendants were traveling east bound on I-20 in Ouachita Parish. *Id.* Corporal Smith was in the inside lane on I-20 and began to approach Defendants, who were traveling in a red Dodge Durango. *Id.* Corporal Smith testified that as he approached Defendants, they "went all the way over to the rumble strips." *Id.* In fact, Corporal Smith testified that he actually heard Defendants' vehicle "hit the rumble strips." *Id.*

Thereafter, Corporal Smith ran the vehicle's license plate, and then initiated a traffic stop.[1] *Id.* at 5. Corporal Smith approached the vehicle and made contact with the driver, Defendant Torres. *Id.* Corporal Smith spoke to Defendant Torres, advised her as to the reason she had been pulled over, and asked for her driver's license. *Id.* Defendant Torres responded that she did not have a drivers license, but instead handed Corporal Smith a "photocopied piece

---

[1] Corporal Smith's dash-mounted camera began recording the traffic stop of Defendants only after the vehicle was pulled over. *See* [doc. # 33-1].

of paper of her ID." *Id.* at 6. Corporal Smith instructed Defendant Torres to step out of the vehicle and step to the rear, and she complied. *Id.* Corporal Smith testified that, at this point, he observed Defendant Santellana in the front passenger seat and another passenger in the rear of the vehicle. *Id.*

 At the rear of the vehicle, Corporal Smith again explained to Defendant Torres why he initiated the traffic stop – that is, because her vehicle crossed the white fog line. *Id.* Additionally, Corporal Smith questioned Defendant Torres about any impairment, specifically her use of drugs and/or alcohol. *Id.* Defendant Torres denied use of any drugs or alcohol, explaining she was just "sleepy." *Id.*; *see also* [doc. # 33-1, at 2:05:08]. Defendant Torres went on to state that she was traveling from Dallas, Texas, and had left "the day before yesterday," then stopped in Corpus Christi, Texas to pick up asthma medication for her younger sister and her ultimate destination was Atlanta, Georgia to visit family. [doc. # 37, P. 7-8]; *see also* [doc. # 33-1, at 2:05:30 to 2:05:43]. Corporal Smith asked her if there were any weapons and/or drugs in the vehicles, which Defendant Torres denied. [doc. # 33-1, at 2:07:30 to 2:09:10].

 Thereafter, Corporal Smith stated that "when he walked up on the vehicle he smelled marijuana" and that he "could see marijuana residue on [Defendant Torres'] shirt." *Id.* at 2:09:35 to 2:09:37. Defendant Torres again denied using marijuana; however, she conceded that she used synthetic marijuana called "K2," which she contended was legal, even offering to show him the bag which had contained it. *Id.* at 2:10:01 to 2:10:10. Corporal Smith responded that "in the state of Louisiana, synthetic marijuana is illegal." *Id.* at 2:10:10 to 2:10:16. Ultimately, Corporal Smith asked Defendant Torres "do you have any problem with me searching the vehicle?" *Id.* at 2:11:12 to 2:11:13; *see also* [doc. # 37, P. 9]. Defendant Torres, without hesitation, responded "No." [doc. # 33-1, at 2:11:14]; *see also* [doc. # 37, P. 13]. At the hearing, Corporal Smith

testified that during their relatively brief conversation (approximately eight minutes), Defendant Torres appeared "extremely nervous. Her speech was shaky. Her knees were shaking. Her hands were shaking and jittering. And the longer I talked to her and had conversation with her, the more nervous she seemed to get." [doc. # 37, P. 8].

After receiving Defendant Torres' consent to search the vehicle, Corporal Smith returned to speak to the owner of the vehicle, Defendant Santellana, who remained seated in the front passenger seat of the vehicle. *Id.* at 9, 13; *see also* [doc. # 33-1, at 2:11:29]. Corporal Smith asked Defendant Santellana "where they were coming from," and she responded "Dallas," and after a long pause, she added that they had left at "10:30." [doc. # 33-1, at 2:11:45 to 2:12:07]. However, Defendant Santellana did not mention making a stop in Corpus Christi for the asthma medication, and when pressed by Corporal Smith about making a "trip to Corpus Christi . . . her anxiety level . . . really started to go up. And she kind of , 'Oh, yeah; oh yeah, I forgot about that." [doc. # 37, P. 10].[2] Corporal Smith asked Defendant Santellana if she had any weapons and/or illegal drugs in the vehicle, to which she replied "No." [doc. # 33-1, at 2:13:19 to 02:13:41]. Finally, Corporal Smith instructed Defendant Santellana to "step out of the vehicle," that he "was going to search it to make sure there was nothing in the vehicle of concern." *Id.* at 2:13:41 to 2:13:48.

Corporal Smith testified at the hearing that, pursuant to Defendant Torres' verbal consent to search the vehicle, he started the search in the "rear cargo area." [doc. # 37, P. 11]. He "noticed a big pile of cloths. And the spare tire to the vehicle was laying on top of the clothes instead of under the vehicle where it normally goes." *Id.* Accordingly, Corporal Smith "pulled the tire out and . . . started sifting through the big pile of clothes. And as [he] got to the bottom

---

[2] This portion of the recording of the traffic stop is inaudible.

of the pile of clothes, there was a pair of jogging pants." *Id.* He pulled the jogging pants out of the pile, and Corporal Smith testified that "they seemed heavy, like, unusually heavy." *Id.* Therefore, he looked down the legs of the pants, "and there were some packages stuffed down in both legs of the jogging pants." *Id.* Corporal Smith testified that "they looked like kind of they were vacuum sealed and some type of white powdery substance inside, which [he] believed at the time to be cocaine." *Id.* Corporal Smith continued searching through the clothing and located another pair of jogging pants, which contained another package of what he believed to be cocaine. *Id.* at 12. Accordingly, Corporal Smith advised Defendants of their Miranda Rights, "placed them in handcuffs," and separated them in three different patrol vehicles. *Id.*

As stated *supra*, Defendant Torres and Defendant Santellana individually filed motions to suppress the evidence seized from Defendant Santellana's vehicle during the aforementioned search. Defendant Santellana puts forth three arguments: (1) the arresting officer did not have legal grounds to justify the traffic stop; (2) any consent to search Ms. Santellana's vehicle was a result of coercion and duress; and, (3) the consent given by Defendant Torres was without proper authority. [doc. # 29-1]. Defendant Torres mirrors Defendant Santellana's first argument and adds that the search was not reasonably related in scope to the circumstances that justified the traffic stop. [doc. # 31-1]. The Government filed a consolidated opposition to both motions, contending: (1) the traffic stop was proper at its inception and established probable cause for the initial traffic stop; (2) Corporal Smith had articulable observations establishing reasonable suspicion to ask Defendant Torres for consent to search the vehicle; and, (3) the consent to search was obtained lawfully, and was freely and voluntarily given. [doc. # 33]

### Law and Analysis

**I.     The Stop and Detention**

5

Defendants contend that the evidence obtained by the state police should be suppressed because the stop and their continued detention following the traffic stop violated their rights under the Fourth Amendment.[3]

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. A traffic stop entails a seizure for purposes of the Fourth Amendment. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (stopping a vehicle and detaining its occupants constitutes a seizure). Traffic stops, whether supported by probable cause or a reasonable suspicion, are analyzed under the standard established by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). *Brigham, supra*. (citations omitted).

Under *Terry*, a law enforcement officer may temporarily detain a person when the "officer has a reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry*, 392 U.S. at 30). Reasonable suspicion may be described as "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Id*. (citing *Ornelas v. United States*, 517 U.S.

---

[3] At the outset, the undersigned notes that Defendant Torres' standing to challenge the instant search is questionable. The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *United States v. Parks*, 684 F.2d 1078, 1082 (5th Cir. 1982). A subjective expectation of privacy is legitimate if it is "one that society is prepared to recognized as reasonable." *Rakas*, 439 U.S. at 143-44. Furthermore, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's . . . property has not had any of his Fourth Amendment rights infringed." *Id*. at 134.

While it is well established that a non-owner passenger of a vehicle, has no standing to challenge the search of the contents of the vehicle, *United States v. Roberson,* 6 F.3d 1088, 1093 (5th Cir. 1993); *Rakas*, 439 U.S. at 143, the issue in this case is whether a nonowner-driver (Defendant Torres) has standing to challenge the constitutionality of a search and seizure of a vehicle.

The Fifth Circuit has not addressed this particular issue, but since it was not raised by either party and the Court's resolution of Defendant Torres' motion to suppress on the merits is not dependant on the issue of standing, the undersigned will assume for purposes of this Report and Recommendation that Defendant Torres has standing to challenge the search.

690, 696 (1996)). To satisfy the Fourth Amendment, the stopping officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000)). The Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence." *Id*. (citation omitted). The validity of the stop is determined under "the totality of the circumstances — the whole picture." *Id*. (citing *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989)).

The *Terry* standard a is two-tiered inquiry: (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001) (citing *Terry*, 392 U.S. at 19-20). Typically, the defendant bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted). However, when the law enforcement officer acts without a warrant, the government bears the burden of proving that the search was valid. *Id*.

      a)     *Terry*'s First Prong

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

To the extent that Defendants challenge the propriety of the initial stop, their claim is without merit. Corporal Smith testified that he directly observed the vehicle Defendant Torres was driving cross the white fog line of I-20 and heard the Defendants' vehicle make contact with

the rumble strips. Defendants have provided no evidence to controvert this testimony. In fact, a review of the recording from Corporal Smith's dash-mounted camera shows that Defendant Torres never disputed that she crossed the white fog line and instead conceded that she was "sleepy." [doc. # 33-1, at 2:05:08]. The undersigned thus concludes that the traffic stop was justified at its inception.

      b)      *Terry's* Second Prong

The second prong of the *Terry* inquiry focuses upon whether the stopping officer's actions were

> reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop. This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop unless further reasonable suspicion, supported by articulable facts, emerges.

*Brigham*, 382 F.3d at 507 (citations omitted).

The Fifth Circuit has recognized that pursuant to an initial traffic stop, a police officer may (1) examine the driver's license and registration of the driver and vehicle, and run a computer check to investigate whether the driver has any outstanding warrants and if the vehicle was stolen; (2) ask the driver to exit the vehicle; and (3) ask the driver and any passengers about the purpose and itinerary of their trip, including other unrelated questions.[4] *See generally Brigham*, 382 F.3d at 508; *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *Shabazz*, 993 F.2d at 437.

Detention during these actions is reasonable under the Fourth Amendment; however, detention which occurs because of additional actions, particularly those taken after a police officer has verified that a driver is not subject to any warrants and that a vehicle is not stolen,

---

[4] "[T]he officer's questions need not even be related to the purpose of the traffic stop, since '[d]etention, not questioning, is the evil at which *Terry's* second prong is aimed.'" *Lopez-Moreno*, 420 F.3d at 431.

may only be taken when there is a reasonable and articulable suspicion that a person has committed or is about to commit a crime. *See United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000). "The suspicion required to justify such a detention need not rise to the level of probable cause but must be based on more than an unparticularized suspicion or hunch." *Id.* (citing *Sokolow*, 490 U.S. at 7). When making a reasonable-suspicion determination, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."[5] *United States v. Grant*, 349 F.3d 192, 197 (5th Cir. 2003) (quoting other sources). If reasonable suspicion appears during the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. *See Lopez-Moreno*, 420 F.3d at 431 (5th Cir. 2005); *Brigham*, 382 F.3d at 507.

In this case, then, the question is whether Corporal Smith's actions after he legitimately stopped Defendants were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion based on articulable facts developed during the stop. Here, Corporal Smith's initial questioning of Defendant Torres was fully within the scope of the initial traffic stop. As cited above, the Fifth Circuit has repeatedly held that pursuant to a valid stop, a police officer may request the driver's license and registration, run a license and criminal background check, and question the driver regarding her origin and itinerary. *See Dortch, supra*. Here, Corporal Smith asked Defendant Torres why she crossed the fog line, why she had been in Dallas, why she was headed to Georgia, and general questions about her travel itinerary. These initial questions were related to the purpose and itinerary of Defendants' trip, only lasted

---

[5] The Fifth Circuit reiterated, however, that police need not "have 'particularized suspicion' based on essentially direct evidence of a particular specific crime in order to form the 'reasonable suspicion' needed to justify a detention." *United States v. Pack*, 612 F.3d 341, 356-57 (5th Cir. 2010).

approximately four minutes, and were fully within the scope of the detention justified by the traffic stop. *See Brigham*, 382 F.3d at 507-08.

      Thereafter, Corporal Smith's undisputed testimony shows that he developed additional reasonable suspicion of criminal activity sufficient to extend the stop beyond the point of just asking general questions regarding Defendants' travel itinerary. First, Defendant Torres suspiciously lacked any proper driver's license, and instead turned over a photocopy of a Texas identification card. Second, during the course of the Corporal Smith's initial questioning, Defendant Torres seemed "extremely nervous." Corporal Smith testified that "her speech was shaky," "her knees were shaking," "her hands were shaking and jittering," and the longer he talked to her "the more nervous she seemed to get." [doc. # 37, P. 8]. Third, Corporal Smith stated that "when he walked up on the vehicle he smelled marijuana" and that he "could see marijuana residue on [Defendant Torres'] shirt." *Id.* at 2:09:35 to 2:09:37. Although Defendant Torres denied using marijuana, she conceded that she used synthetic marijuana called "K2." *Id.* at 2:10:01 to 2:10:10. Fourth and finally, during the initial questioning of Defendant Santellana, the passenger in the vehicle, there were clear discrepancies in the two Defendants' descriptions of their travel itinerary. Specifically, Defendant Torres stated that they had left Dallas "the day before yesterday," then stopped in Corpus Christi, Texas to pick up asthma medication for her younger sister. [doc. # 37, P. 7-8]; *see also* [doc. # 33-1, at 2:05:30 to 2:05:43]. Defendant Santellana initially made no mention of their stop in Corpus Christi and stated that they had left Dallas at "10:30." [doc. # 33-1, at 2:11:45 to 2:12:07]. Corporal Smith also testified that Defendant Santellana continued to exhibit a nervous demeanor when questioned about her travel itinerary, particularly when he pointed out the inconsistencies between their descriptions of the travel itinerary. [doc. # 37, P. 10]. The recording of the traffic stop shows that Corporal Smith

ultimately asked for Defendant Torres' consent to search the vehicle after approximately eight minutes of questioning.

Since the video portion of the traffic cam recording was distorted by fog on Corporal Smith's windshield, the video does not confirm Corporal Smith's testimony regarding Defendant Torres' shaky hands or legs. Nevertheless, the testimony is unrefuted, and the court must permit "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted). The courts are generally obliged to accord deference and even "great respect" to an officer's training and experience. *See United States v. Jenson*, 462 F.3d 399, 405 (5th Cir. 2006). Furthermore, the courts are prohibited from examining and rejecting individually each factor that the police cite as having created reasonable suspicion. *United States v. Pack*, 612 F.3d 341, 358 (5th Cir. 2010), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010) (citation omitted). Thus, even if the facts articulated by the officer are individually consistent with innocent travel, taken together they may amount to reasonable suspicion. *Sokolow*, 490 U.S. at 9 (citations omitted); *Pack*, *supra*.

In the undersigned's opinion, the cumulative effect of Corporal Smith's observations provided him with sufficient reasonable suspicion of criminal activity to extend the stop. For this reason, the continued detention of Defendants was constitutional.

### III.  The Search[6]

---

[6] The Court notes that Corporal Smith may have another avenue for properly effecting a warrantless search of Defendant Santellana's vehicle based purely on probable cause and the automobile exception to Fourth Amendment warrant requirement. Specifically, during the traffic stop Corporal Smith stated that "when he walked up on the vehicle he smelled marijuana" and that he "could see marijuana residue on [Defendant Torres'] shirt." [doc. # 33-1 at 2:09:35 to 2:09:37]. Upon questioning, Defendant Torres conceded that she used synthetic marijuana called "K2." and that she had the bag which had contained it in the car. *Id.* at 2:10:01 to 2:10:10. Under the

As discussed above, Corporal Smith asked Defendant Torres for permission to search Defendant Santellana's vehicle. When consent is considered to have validated a warrantless search, the court must examine "the totality of the circumstances to determine whether the consent was knowingly and voluntarily given." *United States v. Davis*, 749 F.2d 292, 294 (5th Cir. 1985). "The voluntariness of consent is a question of fact" that is reviewed for clear error. *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002).

A federal court "considers six factors in evaluating the voluntariness of consent to search, all of which are relevant, but no one of which is dispositive or controlling." *United States v. Santiago*, 410 F.3d 193, 199 (5th Cir. 2005). Those six factors are: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *Id.*

However, the Court must first determine whether Defendant Torres, as the driver of the vehicle, had the proper authority to give consent to the search of Defendant Santellana's vehicle. Defendant Santellana relies on *United States v. Jara* to support her argument that the Government must establish that Defendant Torres "mutually used the [vehicle] and had joint access to and control of it for most purposes so that it is reasonable to recognize that either [Defendant Torres or Santellana] had the right to permit inspection of the property and that [Defendant Santellana] had assumed the risk that [Defendant Torres] might permit the search." [doc. # 38, P. 16] (citing 86 F.3d 383, 389 (5th Cir. 1996); *United States v. Rizk*, 842 F.2d

---

Synthetic Drug Abuse Prevention Act of 2012, it is illegal to use, possess, or distribute certain forms of synthetic cannabis. However, since the Government does not raise the issue, the Court will limit its analysis to Defendant Torres' consent to the search.

111,112 (5th Cir. 1998). In *Jaras*, police received consent for a search of a vehicle and a suitcase located in the trunk of the vehicle from the driver of the vehicle. *Jara*, 86 F.3d at 386. The driver told the officers that the suitcases belonged to his passenger, the defendant Jaras. *Id.* After the driver gave the officer general consent to search the vehicle, the police found the defendant's suitcases containing marijuana in the car's trunk. *Id.* The court held that "the fact that Jaras's suitcases were contained in the trunk of a car in which he was a passenger is insufficient to show that [the driver] mutually used and had joint control over the suitcases." *Id.* at 389. Therefore, the court concluded that the search of Jaras's suitcases violated the Fourth Amendment because the driver had neither actual nor apparent authority to consent to a search of his passenger's property. *Id.* at 390-91.

      The present matter is factually distinguishable from *Jaras*, as the consent here relates to the general search of the entire vehicle, not a specific piece of property inside the vehicle belonging to the non-consenting occupant. On all fours is the Fifth Circuit's holding in *United States v. Crain*. There the court held that the non-owner driver of an automobile has authority to consent to a search of that vehicle, even over the objection of the passenger who enjoyed a greater ownership interest in the vehicle. 33 F.3d 480 (5th Cir. 1994). *Crain* reiterates the well-settled principle that a "person who has joint control over an automobile may give valid consent to its search." *Id.* at 484 (citing *United States v. Varona-Algos*, 819 F.2d 81, 83 (5th Cir. 1987) (driver's consent to search vehicle valid against passenger who later claimed to be vehicle's owner); *see also United States v. Morales*, 861 F.2d 396, 399-400 (3d Cir. 1988) (driver had authority to consent to search of vehicle, and search was valid against passenger who had leased vehicle). Furthermore, *Crain* instructs that a passenger "assume[s] the risk" that a driver with whom the passenger shares control of the vehicle may consent to it being searched.

13

*Id.* The fact that, at the officer's request, Torres had temporarily stepped out of the vehicle, did not eliminate her joint control of same.

As such, the Court finds that Defendant Torres, as the driver of the vehicle, did have joint possession over the vehicle, and therefore, had the authority to give consent to search Defendant Santellana's vehicle. Further, the undersigned concludes that she gave a general consent to search the entire vehicle. There is no indication in the instant case, as there was in *Jaras*, that Defendant Torres advised Corporal Smith that the vehicle or clothing in the vehicle were not hers. Further, neither Defendants Torres nor Santellana objected to the Corporal Smith's search of the clothing. Thus, the Court concludes and holds that Defendant Torres' consent included the consent to search the clothing found to contain drugs.

This leaves the question of whether Defendant Torres' consent was knowingly and voluntarily given. As stated *supra*, after having Defendant Torres get out of the vehicle and questioning her, Corporal Smith asked "do you have any problem with me searching the vehicle?" [doc. # 33-1, at 2:11:12 to 2:11:13]. Defendant Torres almost instantaneously responded "No." *Id. at* 2:11:14. Furthermore, as Corporal Smith testified at the hearing, there were no instances of police coercion, or apparent threats implicating the voluntariness of Defendant Torres' consent. Again, Defendants have provided no evidence to controvert Corporal Smith's testimony. In addition, a review of the recording shows that, at all times, Corporal Smith conducted himself in a professional, yet friendly manner. He did not raise his voice to the defendants or verbally or physically threaten them. Finally, throughout Corporal Smith's questioning of Defendant Torres there is no indication that she did not understand English. To the contrary, in answer to his questions, posed to her in English, she readily responded, also in English. Therefore, in conclusion, the Court finds that the government has proved that

14

Defendant Torres' consent to the search of the vehicle was both knowing and voluntary.

## Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motions to suppress [docs. # 29,31] filed by Defendants Nora Santellana and Lee Ann Torres be **DENIED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 4th day of January 2013.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE